GREENE CATTLE COMPANY, INC. v. UNITED STATES (No. 4591)[1]

United States Court of Customs and Patent Appeals, January 5, 1949

*Lawrence, Tuttle & Harper* (*Lawrence A. Harper* and *George R. Tuttle* of counsel) for appellant.

*David N. Edelstein*, Assistant Attorney General (*Joseph F. Donohue*, special attorney, of counsel), for the United States.

[Oral argument December 7, 1948, by Mr. Tuttle and Mr. Donohue]

Before GARRETT, Chief Judge, and HATFIELD, JACKSON, O'CONNELL, and JOHNSON, Associate Judges

JOHNSON, Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court, Third Division, pursuant to its decision, C. D. 1076, sustaining the action of the collector of the port of San Francisco in assessing a duty of 3 cents per pound on certain cattle weighing in excess of 700 pounds each which were imported from Mexico and withdrawn from bonded pasture during April 1942, the collector's duty assessment having been made under paragraph 701 of the Tariff Act of 1930.

Appellant contends that the cattle here involved are properly dutiable at 1½ cents per pound under said paragraph 701 as modified by the trade agreement with Canada and the President's proclamation issued thereunder (T. D. 49752 and T. D. 49894).

The undisputed evidence discloses that appellant imported and placed in bonded pasture 498 cows weighing over 700 pounds each, 29 steer calves weighing under 700 pounds each, 97 heifer calves weighing under 700 pounds each, and 2 horses; that after importation 9 of the cows were destroyed and the balance remained in bonded pasture until withdrawn; that they were withdrawn on April 1, 1942; that duty was assessed on 192 of the cows at 1½ cents per pound under paragraph 701 of the Tariff Act of 1930 as modified by the trade agreement with Canada, T. D. 49752, and the President's proclamation issued thereunder, T. D. 50534; that duty was assessed on the remaining 297 cows at 3 cents per pound under paragraph 701, *supra*, pursuant to instructions from the Bureau of Customs that this latter number exceeded the quota from countries other than Canada and so were not entitled to the lower rate; that the number of cattle of this class entering this country from all foreign countries in 1942 did not reach 225,000 for the calendar year; that in 1942, 3,551 head of cattle of this class from Mexico were entered into warehouses during April, none from Canada, or other countries, and 18,357 head from Mexico were withdrawn from warehouses (bonded pasture) during April, one from Canada, and none from other countries; and that for the entire second quarter, 7,676 head from Mexico were entered into warehouses, none from Canada or other countries, and 18,729 head from Mexico were withdrawn from warehouses, one from Canada and none from other countries.

The pertinent portions of the Tariff Act of 1930, the amending statute, Canadian Trade Agreement, and Presidential proclamation read as follows:

[PAR. 701, Tariff Act of 1930, (46 Stat. 590).]

PAR. 701. Cattle, * * *; weighing seven hundred pounds or more each, 3 cents per pound * * *.

[SEC. 350 of the Tariff Act of 1930, as added by 48 Stat. 943, 19 U. S. C. sec. 1351 (the so-called Reciprocal Trade Agreements Act) and extended by Joint Resolutions of Congress approved March 1, 1937 (50 Stat. 24) and April 12, 1940 (54 Stat. 107).]

Sec. 350. (a) For the purpose of expanding foreign markets for the products of the United States (as a means of assisting in the present emergency in restoring the American standard of living, in overcoming domestic unemployment and the present economic depression, in increasing the purchasing power of the American public, and in establishing and maintaining a better relationship among various branches of American agriculture, industry, mining, and commerce) by regulating the admission of foreign goods into the United States in accordance

with the characteristics and needs of various branches of American production so that foreign markets will be made available to those branches of American production which require and are capable of developing such outlets by affording corresponding market opportunities for foreign products in the United States, the President, whenever he finds as a fact that any existing duties or other import restrictions of the United States or any foreign country are unduly burdening the restricting the foreign trade of the United States and that the purpose above declared will be promoted by the means hereinafter specified, is authorized from time to time—

(1) To enter into foreign trade agreements with foreign governments or instrumentalities thereof; and

(2) To proclaim such modifications of existing duties and other import restrictions, or such additional import restrictions, or such continuance, and for such minimum periods, of existing customs or excise treatment of any article covered by foreign trade agreements, as are required or appropriate to carry out any foreign trade agreement that the President has entered into hereunder. No proclamation shall be made increasing or decreasing by more than 50 per centum any existing rate of duty or transferring any article between the dutiable and free lists. The proclaimed duties and other import restrictions shall apply to articles the growth, produce, or manufacture of all foreign countries, whether imported directly, or indirectly: *Provided,* That the President may suspend the application to articles the growth, produce, or manufacture of any country because of its discriminatory treatment of American commerce or because of other acts or policies which in his opinion tend to defeat the purposes set forth in this section; and the proclaimed duties and other import restrictions shall be in effect from and after such time as is specified in the proclamation. The President may at any time terminate any such proclamation in whole or in part.

(b) Nothing in this section shall be construed to prevent the application, with respect to rates of duty established under this section pursuant to agreements with countries other than Cuba, of the provisions of the treaty of commercial reciprocity concluded between the United States and the Republic of Cuba on December 11, 1902, or to preclude giving effect to an exclusive agreement with Cuba concluded under this section, modifying the existing preferential customs treatment of any article the growth, produce, or manufacture of Cuba: *Provided,* That the duties payable on such an article shall in no case be increased or decreased by more than 50 per centum of the duties now payable thereon.

(c) As used in this section, the term 'duties and other import restrictions' includes (1) rate and form of import duties and classification of articles, and (2) limitations, prohibitions, charges, and exactions other than duties, imposed on importation or imposed for the regulation of imports.

[ARTICLE III of the trade agreement with Canada, T. D. 49752.]

If imports of any article into either country should be regulated either as regards the total amount permitted to be imported or as regards the amount permitted to be imported at a specified rate of duty, and if shares are allocated to countries of export, the share allocated to the other country shall be based upon the proportion of the total imports of such article from all foreign countries supplied by that country in past years, account being taken in so far as practicable in appropriate cases of any special factors which may have affected or may be affecting the trade in that article. In those cases in which the other country is a relatively large supplier of any such article, the Government of the country imposing the regulation shall, whenever practicable, consult with the Government of the other country before the share to be allocated to that country is determined.

[SCHEDULE II of the trade agreement with Canada, T. D. 49752.]

\*　　\*　　\*　　\*　　\*　　\*　　\*

| Tariff Act of 1930; paragraph | Description of article | Rate of duty |
|---|---|---|
| | \*　　\*　　\*　　\*　　\* | |
| 701 | Cattle, weighing seven hundred pounds or more each: | |
| | Cows, imported specially for dairy purposes_____ | 1½¢ per lb. |
| | Other_____ | 1½¢ per lb. |
| | *Provided,* That after December 31, 1938, such cattle weighing seven hundred pounds or more each (other than cows imported specially for dairy purposes) entered, or withdrawn from warehouse, for consumption in excess of 60,000 head in any quarter year shall not be entitled to a reduction in duty by virtue of this item, and such cattle (other than cows imported specially for dairy purposes) entered, or withdrawn from warehouse, for consumption in excess of 225,000 head in any calendar year shall not be entitled to a reduction in duty by virtue of this item, but the rate of duty thereon shall not exceed_____ | 3¢ per lb. |
| | *Provided further,* That if, after consultation with the Government of the United States of America, the Government of Canada requests the allocation of the quantity entitled to enter at the reduced rate of duty under this item, the Government of the United States of America shall take the necessary steps to allocate the said quantity among countries of export on the basis provided for in Article III of this Agreement. | |

[The proclamation of the President dated December 22, 1941, T. D. 50534, providing for the allocation of quotas on cattle.]

WHEREAS it is provided in the Tariff Act of 1930 of the Congress of the United States of America, as amended by the Act of June 12, 1934, entitled "An Act To amend the Tariff Act of 1930" (48 Stat. 943), which amending Act, was extended by Joint Resolutions of Congress, approved March 1, 1937 (50 Stat. 24), and April 12, 1940 (54 Stat. 107), as follows:

\*　　\*　　\*　　\*　　\*　　\*　　\*

WHEREAS, pursuant to the said Tariff Act of 1930, as amended, I entered into a foreign Trade Agreement on November 17, 1938, with His Majesty the King of Great Britain, Ireland and the British dominions beyond the Seas, Emperor of India, in respect of Canada, which Agreement I did proclaim and make public by my proclamations of November 25, 1938 and June 17, 1939;

\*　　\*　　\*　　\*　　\*　　\*　　\*

WHEREAS, by my proclamation of February 27, 1939 I did proclaim the allocation among countries of export of the quantity of cattle weighing seven hundred pounds or more each (other than cows imported specially for dairy purposes) entitled to a reduction in duty by virtue of the said item 701 of Schedule II annexed to the said Agreement during the period April 1 to December 31, 1939 inclusive;

WHEREAS, by my proclamations of November 30, 1939 and November 30, 1940, such allocation was continued for the calendar years 1940 and 1941;

WHEREAS, after consultation with the Government of the United States of America, the Government of Canada has requested the Government of the United States of America to continue such allocation during the calendar year 1942;

WHEREAS such allocation is required and appropriate to carry out the said Agreement;

WHEREAS I find that, taking into account special factors affecting the trade, imports into the United States of America from all countries of such cattle weighing seven hundred pounds or more each (other than cows imported specially for dairy purposes) during the years 1936 and 1937 were representative of the trade in such articles;

AND WHEREAS I find that the proportions of total imports into the United States of America for consumption of such cattle weighing seven hundred pounds or more each (other than cows imported specially for dairy purposes) supplied by Canada and by other foreign countries, respectively, during the years 1936 and 1937 were as follows:

Canada_____ 86.2 per centum

Other foreign countries_____ 13.8 per centum

Now, THEREFORE, be it known that I, Franklin D. Roosevelt, President of the United States of America, acting under the authority conferred by the said Tariff Act of 1930, as amended, do hereby proclaim that, unless this proclamation is subsequently modified, no more than 193,950 head of cattle weighing seven hundred pounds or more each (other than cows imported specially for dairy purposes), the produce of Canada, nor more than 31,050 head of such cattle, the produce of other foreign countries, entered, or withdrawn from warehouse, for consumption during the calendar year 1942, shall be entitled to a reduction in duty by virtue of the said item 701 of Schedule II of the said Agreement; and that, unless this proclamation is subsequently modified, no more than 51,720 head of cattle weighing seven hundred pounds or more each (other than cows imported specially for dairy purposes), the produce of Canada, nor more than 8,280 head of such cattle, the produce of other foreign countries, entered, or withdrawn from warehouse, for consumption in any calendar quarter year during 1942, shall be entitled to a reduction in duty by virtue of the said item 701 of Schedule II of the said Agreement.

Appellant does not contend that the President did not have authority to establish quotas limiting the number of cattle which could be imported at the reduced rate, but contends that the President did not have authority to allocate different percentages of that quota to Canada and to other countries.

The Reciprocal Trade Agreements Act, *supra*, gives the President authority to conclude trade agreements with foreign countries and to "proclaim such modifications of existing duties and *other import restrictions, or such additional import restrictions*, or such continuance, and for such minimum periods, of existing customs or excise treatment of any article covered by foreign trade agreements, as are required or appropriate to carry out any foreign trade agreement that the President has entered into hereunder." [Italics ours.]

Subdivision (c) of sec. 350, *supra*, provides that "the term 'duties and *other import restrictions*' includes (1) rate and form of import duties and classification of articles, and (2) *limitations, prohibitions, charges, and exactions other than duties, imposed on importation or imposed for the regulation of imports.*" [Italics ours.]

The trial court held that "A quota is certainly a limitation on importation and is therefore authorized by the Reciprocal Trade Agreements Act." With this we agree.

The Reciprocal Trade Agreements Act, *supra*, authorizes the President to enter into trade agreements with foreign countries. The President did enter into a trade agreement with Canada. The agreement provides, "That if, after consultation with the Government of

the United States of America, the Government of Canada requests the allocation of the quantity entitled to enter at the reduced rate of duty under this item, the Government of the United States of America shall take the necessary steps to allocate the said quantity among countries of export on the basis provided for in Article III of this Agreement." Article III of the agreement provides, "If imports of any article into either country should be regulated either as regards the total amount permitted to be imported or as regards the amount permitted to be imported at a specified rate of duty, and *if shares are allocated to countries of export, the share allocated* to the other country shall be based upon the proportion of the total imports of such article from all foreign countries supplied by that country in past years, * * *." [Italics ours.]

The President's proclamation, T. D. 50534, *supra*, states *inter alia*:

WHEREAS I find that, taking into account special factors affecting the trade, imports into the United States of America from all countries of such cattle weighing seven hundred pounds or more each (other than cows imported specially for dairy purposes) during the years 1936 and 1937 were representative of the trade in such articles;

AND WHEREAS I find that the proportions of total imports into the United States of America for consumption of such cattle * * * supplied by Canada and by other foreign countries, respectively, during the years 1936 and 1937 were as follows:

Canada_____ 86.2 per centum
Other foreign countries_____ 13.8 per centum * * *.

The proclamation then provides that

* * * no more than 193,950 head of cattle * * * the produce of Canada, nor more than 31,050 head of such cattle, the produce of other foreign countries, * * * for consumption during the calendar year 1942, shall be entitled to a reduction in duty * * *; and that, * * * no more than 51,720 head of cattle * * * the produce of Canada, nor more than 8,280 head of such cattle, the produce of other foreign countries * * *, for consumption in any calendar quarter year during 1942, shall be entitled to reduction in duty by virtue of the said item 701 of Schedule II of the said Agreement.

The President's proclamation did not discriminate against other foreign countries in favor of Canada. The quotas allowed were based upon the proportion of the total imports of cattle weighing in excess of 700 pounds per head (other than cows imported specifically for dairy purposes) supplied by Canada and by other foreign countries during the years 1936 and 1937.

The language of the statute does not expressly authorize the President to "allocate quotas" in those words, but it does authorize him to "proclaim such modifications of existing duties and other import restrictions, * * * as are required or appropriate to carry out any foreign trade agreement that the President has entered into hereunder" and the statute says that "the term 'duties and other import

restrictions' includes   *   *   *   (2) limitations, prohibitions, charges, and exactions other than duties, imposed on importation or imposed for the regulation of imports."

Thus it will be seen that the statute specifically gives the President the authority to enter into foreign trade agreements and specifically authorizes him to proclaim such modifications of existing duties and other import restrictions as are required or appropriate to carry out any such agreement which he has entered into under the authority of the statute (Reciprocal Trade Agreements Act).

During the hearings before the Ways and Means Committee of the House of Representatives in 1940 on the Extension of the Reciprocal Trade Agreements Act there was considerable discussion of the allocation of the tariff quota on petroleum in the trade agreement of November 6, 1939, with Venezuela, T. D. 50015, and the proclamation of December 12, 1939, T. D. 50040, relating thereto. These hearings developed that the proclamation provided for a quota allocation based on what the trade had been in a recent period, and it gave 71.9 per cent to Venezuela, 20.3 per cent to the Netherlands, 4.0 per cent to Colombia, and 3.8 per cent to "other foreign countries." During these discussions there was no suggestion that the President had exceeded his authority in making the allocation of the tariff quota under the Trade Agreements Act. The report of the Ways and Means Committee made no such suggestion.

After the trade agreement with Canada providing for an allocation of quotas was entered into in 1938, Congress, which certainly had knowledge of the President's interpretation of the Trade Agreements Act, on April 12, 1940, extended the President's power to enter into trade agreements for a period of three years (54 Stat. 107), and subsequent Congresses, which have had knowledge of the President's proclamation here involved, as well as his proclamation regarding petroleum quotas, T. D. 50040, *supra*, have on three occasions extended the Trade Agreements Act without changing the pertinent provisions of the Act; on June 7, 1943, it was extended for two years (57 Stat. 125), and on July 5, 1945, for 3 years (59 Stat. 410), while on June 26, 1948, it was extended for approximately one year (Pub. Law 792, 80th Congress).

In *Fleming, Temporary Controls Administrator* v. *Mohawk Wrecking & Lumber Co. et al.*, 331 U. S. 111, 116, in referring to powers granted the President by section 1 of the First War Powers Act, it was held:

Section 1 of the First War Powers Act does not explicitly provide for creation of a new agency which consolidates the functions and powers previously exercised by one or more other agencies. But the Act has been repeatedly construed by the President to confer such authority. Such construction by the Chief Executive, being both contemporaneous and consistent, is entitled to great weight. See *United States* v. *Jackson*, 280 U. S. 183, 193; *Billings* v. *Truesdell*, 321 U. S. 542,

552–553. And the appropriation by Congress of funds for the use of such agencies stands as confirmation and ratification of the action of the Chief Executive. *Brooks* v. *Dewar*, 313 U. S. 354, 361.

Both the House of Representatives and the Senate, after lengthy hearings and full consideration, and with knowledge of the President's interpretation of the Trade Agreements Act, have continued to extend the President's power to enter into trade agreements, and have continued to make appropriations to carry on this function. This action by Congress amounts to legislative approval of the President's action in allocating quotas. Therefore it seems plain that Congress intended to authorize the President to do what he h·is done in the instant case; to wit, make allocations of quotas in trade agreements.

·. Appellant contends, "Even if the allocations should be deemed proper under a correct construction of the said Canadian Trade Agreement, cattle from other countries were entitled to benfit from such portion of the quota assigned to Canada of which Canadian exporters did not take advantage."

The proclamation of the President, T. D. 50534, *supra*, states that he finds that the years 1936 and 1937 were representative of the import trade in cattle weighing in excess of 700 pounds per head (other than cows imported specially for dairy purposes) from all countries; that the proportions of total imports into the United States for consumption of such cattle supplied by Canada and by other foreign countries during the years 1936 and 1937 were, Canada, 86.2 per cent, and other foreign countries, 13.8 per cent; that *no more* than 193,950 head of such cattle, the produce of Canada, *nor more than* 31,050 head of such cattle, the produce of other foreign countries, shall be entitled to a reduction in duty during the calendar year 1942; and that *no more than* 51,720 head of such cattle, the produce of Canada, *nor more than* 8,280 head of such cattle, the produce of other foreign countries, shall be entitled to a reduction in duty during any quarter year of 1942.

The President's proclamation, *supra*, permits the importation of cattle in the same proportions as imported during 1936 and 1937. This seems to be an equitable method of allocation of the quantity which may be imported, and is in accordance with the basis specified in Article III of the Canadian Trade Agreement, *supra*.

The President's proclamation specifically provides that "no more than" and "nor more than" the numbers set out for the year and quarter year, respectively, for Canada and "other foreign countries" shall be imported during the period specified. The fact that during the second quarter of 1942 there was not imported from Canada the total quantity permitted at the reduced rate did not give· Mexico or any other country the right to import into the United States at the reduced rate more than the quantity provided for "other foreign

countries" for a quarter year period of 1942 in the President's proclamation.

We have examined with care all the authorities cited by counsel for appellant and have given due consideration to the other points which he has raised; but in view of what has already been stated, we deem it unnecessary to discuss them here.

For the reasons set out, the judgment of the Customs Court is *affirmed*.